DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Christopher Markovanovich, appeals his conviction and sentence in the Summit County Court of Common Pleas. We affirm.
 {¶ 2} Appellant was indicted on one count of murder, in violation of R.C. 2903.02(A), a special felony; one count of murder in violation of R.C. 2903.02(B), a special felony; one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; and three counts of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree. Appellant was supplementally indicted for one count of felonious assault, in violation of R.C. *Page 2 2903.11(A)(1), a felony of the second degree and one count of obstructing official business, in violation of R.C. 2921.31(A), a misdemeanor of the second degree.
 {¶ 3} At the conclusion of the State's evidence, the trial court granted appellant a judgment of acquittal on the obstructing official business and tampering with evidence charges. At the conclusion of trial, the jury found appellant guilty of one count of murder, in violation of R.C. 2903.02(A), for the beating death of Lee Ann Cucuzza; two counts of assault against Stacy Morgan and Linda Coontz; and the felonious assault of Shelly Peterson. Appellant was sentenced to life imprisonment with parole eligibility after fifteen years on the murder conviction, 90 days in Summit County Jail for each of the two counts of assault, and eight years imprisonment for the felonious assault conviction, to be served consecutively with appellant's other sentences for a total period of incarceration of 23 years to life.
 {¶ 4} Appellant timely appealed his convictions and raises six assignments of error.
 ASSIGNMENT OF ERROR I "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY NOT SEVERING THE MURDER COUNT REGARDING LEE ANN CUCUZZA FROM THE FELONIOUS ASSAULT COUNT REGARDING SHELLY PETERSON."
 {¶ 5} In his first assignment of error, appellant argues that the trial court erred in denying his motion to sever the murder charge for the death of Lee Ann *Page 3 
Cucuzza from the felonious assault charge for the assault against Shelly Peterson. This Court disagrees.
 {¶ 6} While appellant filed a motion to sever before trial, he failed to thereafter renew his motion at the close of the State's case in chief or at the close of all of the evidence presented at trial. In State v.Morgan, 9th Dist. No. 22848, 2006-Ohio-3921, we held:
 "`[W]hen [a] motion for severance was made prior to trial and was not renewed at the completion of the State's case in chief, or at the conclusion of all the evidence, it is deemed waived.' State v. Mitchell (Feb. 25, 1981), 9th Dist. No. 9815, at 5, citing State v. Owens (1975), 51 Ohio App.2d 132, 145-146. In State v. Glover, the Court noted that even if an appellant filed a pretrial motion to sever, failure to renew that motion at the close of the State's evidence or at the close of all of the evidence waived `any previous objection to the joinder of [the] offenses for trial, thereby failing to preserve the issue for appeal.' 8th Dist. No. 84413, 2005-Ohio-1984, at ¶ 26. As Defendant failed to renew his motion to sever, we find that he waived his right to raise the issue on appeal." Morgan at ¶ 11.
 {¶ 7} Here, appellant failed to renew his motion to sever and, as inMorgan, we find that appellant waived his right to raise the issue on appeal. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY NOT GRANTING THE MOTION IN LIMINE IN PREVENTING THE TESTIMONY REGARDING THE ASSAULT COUNTS."
 {¶ 8} Appellant asserts that the trial court erred in denying his motion in limine requesting that evidence of prior assaults be excluded from trial. In his *Page 4 
motion in limine, which the trial court denied, appellant sought to exclude the testimony of Stacy Morgan, Linda Coontz aka Linda Baughman, and Eric Humphrey. The State asserts that the trial court properly denied appellant's motion and asserts that the testimony at issue was proper other acts evidence pursuant to R.C. 2945.59. As further explained herein, this Court declines to address this assignment of error because appellant failed to preserve it for appeal.
 {¶ 9} We begin by noting that Stacy Morgan and Linda Baughman testified at trial, without objection, followed by two other witnesses (Alisa and Timothy Preib). Defense counsel then renewed his motion in limine, which the trial court again denied. The following day, Eric Humphrey testified, without objection. Appellant did not renew his motion in limine related to Mr. Humphrey's testimony.
 {¶ 10} With regard to Mr. Humphrey's testimony, this Court has stated, that "[w]here a motion in limine has been denied, an objection to the ruling must be renewed when it arises at trial in order for the objection to be preserved." State v. Blazo, 9th Dist. No. 23054,2006-Ohio-5418, at ¶ 5, citing State v. Ramos, 9th Dist. No. 05CA008830,2006-Ohio-4534, at ¶ 16; State v. Hill (1996), 75 Ohio St.3d 195,202-03; State v. Brown (1988), 38 Ohio St.3d 305, paragraph three of the syllabus. In this case, appellant did not renew his motion in limine and/or object to the admission of Mr. Humphrey's other acts testimony. Accordingly, appellant *Page 5 
waived his right to appeal the trial court's ruling on the motion in limine in relation to Mr. Humphrey's testimony.
 {¶ 11} With regard to Ms. Baughman's and Ms. Morgan's testimony, appellant did renew his motion in limine; however, he did not renew it timely. This Court has held that, "[b]y failing to raise the issues involved `when the issue [was] actually reached and the context 
developed at trial,' Appellants waived the right to raise this issue on appeal." Callahan v. Akron Gen. Med. Ctr., 9th Dist. No. 22387,2005-Ohio-5103, at ¶ 23, quoting State v. Grubb (1986),28 Ohio St.3d 199, 203. In Grubb, the Supreme Court held that renewing a motion and/or objection in the context of when it is offered at trial is important because, "the trial court is certainly at liberty `* * * to consider the admissibility of the disputed evidence in its actual context.'"Grubb, 28 Ohio St.3d at 202, quoting State v. White (1982),6 Ohio App.3d 1, 4.
 {¶ 12} Here, two intervening witnesses who saw Lee Ann Cucuzza's attack, testified between the testimony of Ms. Baughman and Ms. Morgan and defense counsel's renewal of his motion in limine. The intervening witnesses were not other acts witnesses or victims as were Ms. Morgan and Ms. Baughman. Thus, the trial court did not have the opportunity to revisit its earlier ruling in the context in which the testimony of Ms. Morgan and Ms. Baughman was introduced. Because defense counsel failed to renew his motion in limine at the time of Ms. Morgan's and Ms. Baughman's testimony, appellant has forfeited his right to appeal the trial *Page 6 
court's ruling on his motion in limine, in relation to the testimony of Ms. Baughman and Ms. Morgan. Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY NOT GRANTING JUDGMENT OF ACQUITTAL PURSUANT TO THE RULE 29 MOTION."
 ASSIGNMENT OF ERROR IV "DUE PROCESS IS DENIED AN ACCUSED WHERE THE CONVICTION HAS BEEN OBTAINED UPON EVIDENCE INSUFFICIENT AS A MATTER OF LAW AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 13} Appellant argues that the trial court committed error when it denied his Crim.R. 29 motion for acquittal. Specifically, appellant argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
 {¶ 14} "`While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion.'" State v. Ashby, 9th Dist. No. 06CA0077-M, 2007-Ohio-3118, at ¶ 15, quoting State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390. Further,
 "`[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the *Page 7 
evidence will also be dispositive of the issue of sufficiency.'" (Emphasis omitted.) Id., quoting State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462.
 {¶ 15} Therefore, we will address appellant's claims that his convictions were against the manifest weight of the evidence first, as they are dispositive of appellant's claims of insufficiency.
 {¶ 16} When a criminal defendant asserts that his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 17} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State.
 {¶ 18} Appellant was convicted of murder in violation of R.C.2903.02(A), which states that "[n]o person shall purposely cause the death of another[.]"
 {¶ 19} Appellant was convicted of assault, in violation of R.C.2903.13(A), which states that, "[n]o person shall knowingly cause or attempt to cause physical harm to another[.]" *Page 8 
 {¶ 20} Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(1), which states that, "[n]o person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn[.]"
 {¶ 21} The jury heard testimony from 29 witnesses. The State produced Gino Cucuzza, Janet Wagner, Shelly Peterson, Anthony Kelley, Jude Carroll, Kris Beitzel, Russ McFarland, Stacy Morgan, Patricia Baughman, Alisa Preib, Timothy Preib, Cindy Ulrich, Byron Jackson, Crystal Albright, Eric Humphrey, Joseph Bodnar, Michael Fox, Donald Frost, Jeffrey Houser, Michelle Snyder, Lynda Eveleth, Regina King, Stacy Violi, Richard Morrison, David Hayes, John Bell, Lisa Kohler, M.D., and Terrance Hudnall. The defense produced Janet Lookabaugh. Appellant did not testify.
1. Gino Cucuzza
 {¶ 22} Mr. Cucuzza was the victim's advocate on behalf of Lee Ann Cucuzza and Lee Ann's husband for 16 years. Mr. Cucuzza testified that Lee Ann exercised every day by walking in their neighborhood every morning between 5:30 and 6:00 a.m., after which he would drive her to work at a nearby laundromat. On August 6, 2006, the day of Lee Ann's death, Mr. Cucuzza said that his wife was sleeping when he came to bed. He was awakened around 6:12 a.m. by police entering his home with flashlights. He answered questions posed by the police, but it was Lee Ann's daughter, Kelly, who later told him that Lee Ann was dead. Lee Ann had never expressed any fear to him about being stalked. *Page 9 
2. Janet Wagner
 {¶ 23} Ms. Wagner lives near the church parking lot in which Shelly Peterson was attacked. She testified that on the morning of September 26, 2005, she heard a terrible scream. She grabbed the phone to call 911 while running to the window to look outside. Ms. Wagner testified that she saw a man stomping a lady. He would walk away and then run up and kick her in the head. Ms. Wagner testified that the attack went on for a long time until the police got there. She did not see the attacker's face but saw his hands, which were those of a white man. Ms. Wagner authenticated the audiotape of her telephone call to 911 and the tape was then played in open court. In her 911 call, Ms. Wagner told the 911 operator that the assailant was wearing a dark colored jacket with a hood and she could not tell if the assailant was white or black.
3. Shelly Peterson
 {¶ 24} Ms. Peterson was the victim of an assault by appellant. In September of 2005, she was employed as a prostitute and lived on the east side of Akron. On September 26, 2005, at approximately 3:00 a.m., Ms. Peterson testified that she was not working and instead had been walking through a church parking lot to get cigarettes at the Citgo station on Market Street when she was attacked by a white man. She was first hit in the back of the head and then was kicked many times in the face and head while she was lying on the ground. The man told her he was "going to take out [her] eye with [his] finger" and he tried to *Page 10 
do so. She tried to crawl away and he would drag her back by her pony tail. Ms. Peterson testified that she saw the man's face and had never seen the man before. While he was beating her, he said he was "tired of prostitutes taking his money." She continually screamed and pleaded for her life. Eventually, the police arrived and the man left.
 {¶ 25} Ms. Peterson testified that she was taken to the intensive care unit at the hospital with every bone in her face broken and bleeding in the brain. The police came to the hospital to show her a photo array and she identified appellant. At trial, Ms. Peterson identified the photo array and several pictures of herself after the assault. Ms. Peterson further testified that the police took a buccal swab from her after she had been released from the hospital. Ms. Peterson identified appellant in open court.
 {¶ 26} On cross-examination, Ms. Peterson acknowledged that she had previous convictions for prostitution, possession of a controlled substance, and aggravated burglary. On the night she was attacked, she did not try to solicit appellant. Appellant was wearing a hat and glasses, but not a jacket. Ms. Peterson testified that although she was in pain, she was alert enough to make the photo identification of appellant from the photo array presented to her at the hospital. Ms. Peterson acknowledged failing to appear when the case against appellant stemming from his attack upon her was originally set for trial a year before. She *Page 11 
explained that she was homeless. Ms. Peterson testified that she believed that appellant would be prosecuted without her based on DNA evidence.
4. Officer Kelly
 {¶ 27} Officer Kelley of the Akron Police Department was a responding officer to a 911 call from a witness seeing Shelly Peterson's attack. He found Ms. Peterson in the church parking lot and described her face as being bloody and the victim as being upset and nervous. The officer testified that Ms. Peterson described her attacker as a white male wearing a white shirt, jeans and a baseball hat. He was six feet tall, skinny, and had a beard and short hair. The officer testified that the victim had been lying on a jacket at the scene that she indicated was not hers. He traveled with the victim to the hospital where Sergeant Beitzel took pictures of her.
5. Officer Carroll
 {¶ 28} Officer Carroll responded to the scene where Shelly Peterson was attacked.
 {¶ 29} When he arrived, he checked the area for a suspect. He had no direct contact with Ms. Peterson. He started looking for the suspect while cruising in his car, but testified that upon his return to the scene, the suspect was there. Officer Carroll testified that the suspect started running when he saw him despite Officer Carroll's identifying himself as a police officer and telling him to stop. He caught the suspect behind a nearby house and transported him to the police station. *Page 12 
Officer Carroll testified that he collected a jacket as evidence at the scene, which was tagged and given to the crime scene unit along with the suspect's other clothing. He did not recover a white shirt. The suspect about whom he testified was appellant. Officer Carroll testified that he observed that appellant's right hand was injured and swollen on the night he was arrested.
 {¶ 30} The officer identified each item of clothing presented in court as being those that were actually on appellant on the night he was arrested. The officer identified a picture of appellant taken on the night of his arrest and identified appellant in open court.
6. Sergeant Beitzel
 {¶ 31} Sergeant Beitzel responded to the area of Ms. Peterson's attack. He never went to the actual scene, instead meeting Officer Kelley at the hospital to take photographs of the victim. Sergeant Beitzel described the victim as being in pretty poor shape and trying to speak in spite of her broken jaw. When he heard over the radio of the arrest of appellant, he returned to the police station to supervise a photo array. He took the photo array back to the hospital and Ms. Peterson identified appellant. He then returned the photo array to the police station to put it into evidence.
7. Detective McFarland
 {¶ 32} Detective McFarland is a member of the crimes against persons unit and was part of the investigation of Shelly Peterson's attack. Appellant told the *Page 13 
detective, "I'm tired of these prostitutes taking advantage of me at this point. I'm tired of these whores f***ing with me."
 {¶ 33} Detective McFarland took buccal swabs from Ms. Peterson and took pictures of injuries to the victim's hands and knees. He also took buccal swabs from appellant under the authority of a court order after appellant refused to voluntarily provide such samples. The detective identified the buccal swabs in court and testified that the swabs were submitted to BCI. He later learned that Shelly Peterson's case against appellant was not going forward because Ms. Peterson could not be located.
 {¶ 34} Detective McFarland also testified about his involvement with the murder of Lee Ann Cucuzza. The detective interviewed assault victim Stacy Morgan who called into the police station after Ms. Cucuzza's death. The detective identified appellant in open court.
8. Stacy Morgan
 {¶ 35} Stacy Morgan was appellant's neighbor and a drinking buddy. She and appellant usually drank on the front porch of one of their apartments. After the evening of August 5, 2006, she did not see appellant on his porch, which was unusual. Ms. Morgan testified that although she was a former prostitute, appellant was never her client.
 {¶ 36} Ms. Morgan testified that on August 5, 2006, appellant called her and asked her to come over for a few beers. When she arrived, appellant was very *Page 14 
intoxicated and was coming on to her, using strong language that he had not used before and acting jealous. Despite appellant's behavior, she walked with appellant to a local bar where he continued to act in a hostile and jealous manner, eventually leaving her at the bar. Ms. Morgan testified that when she returned home, appellant was in the complex talking to other neighbors. Appellant again was verbally abusive and then physically attacked her and her male friend as Ms. Morgan was walking that friend to his car. The male friend left in his car, but appellant chased her around in the apartment complex, threatening her despite appellant's friend Eric telling him to stop. Ms. Morgan testified that she sought the assistance of her friend and roommate Patty Baughman, but that appellant then attacked Patty, grabbing her by her hair. Eric again stepped in to help. Appellant was acting intoxicated and crazy, unlike he had ever behaved before. Finally, Ms. Morgan indicated a friend arrived and she left the scene. Later, after Ms. Morgan heard about Ms. Cucuzza's murder, she contacted police and told them what had happened to her that night. Ms. Morgan identified appellant in open court as the man who assaulted her.
 {¶ 37} On cross-examination, Ms. Morgan acknowledged that she was currently in jail and had felony convictions for permitting drug abuse and possession of cocaine. Ms. Morgan also testified that she had a misdemeanor theft conviction. *Page 15 
9. Patricia Baughman
 {¶ 38} Ms. Baughman (aka Linda Coontz) had been convicted for prostitution and possession of drugs. Ms. Baughman testified that Stacy Morgan was her good friend and they lived together in an apartment in August of 2006. She did not know appellant other than seeing him as a neighbor and knowing that he and Stacy Morgan would sometimes go drink together. Ms. Baughman's testimony supported that of Stacy Morgan. She testified that when she tried to calm the situation between appellant and Stacy, he grabbed her by her pony tail, stuck his fist in her face, and told her he would bash her face in. Another neighbor, Eric, convinced appellant to let her go.
 {¶ 39} Ms. Baughman indicated that a few days later, the police came to her door looking for appellant and she answered questions, telling them what he had done to her on August 5, 2006. Ms. Baughman identified appellant in open court.
 {¶ 40} On cross-examination, Ms. Baughman admitted she had been drinking that day and that Stacy Morgan drank every night and was an alcoholic.
10. Alisa Preib and Timothy Preib
 {¶ 41} Ms. Preib and her son, Timothy, were Lee Ann Cucuzza's neighbors; their backyards abutted. She and her family usually saw Ms. Cucuzza when she was doing yard work or walking, which she did every morning. On August 6, 2006, Tim awakened Ms. Preib to tell her someone was getting hurt out on the street. *Page 16 
 {¶ 42} They looked out the window and saw the attack. Both Ms. Preib and Timothy identified pictures of the scene, including the bedroom window from which she saw the attack. Ms. Preib and Timothy described the attack as seeing a man kicking and stomping the head area of someone on the street beside a car. Ms. Preib testified that she saw the man walk away and then return placing his hand on the car so he could bend over and kick again. Ms. Preib testified that the man then casually walked away, after which she called the police and described the assailant as an average built white man. Ms. Preib authenticated the audiotape of the call she made to 911, which supported her testimony at trial. Timothy testified that he knew Lee Ann and her husband, Gino, and that the assailant was not Gino.
 {¶ 43} On cross-examination, Ms. Preib acknowledged that it was dark at the time of the attack and that she could not identify appellant. On redirect, Ms. Preib testified as to the existence of a street light near the scene and indicated that a nearby tree did not block her view.
12. Cindy Ulrich
 {¶ 44} Ms. Ulrich was Lee Ann Cucuzza's neighbor for 12 years. She testified that she saw Lee Ann on her usual morning walk around 5:30 a.m. on August 6, 2006. Ms. Ulrich also testified that the apartment building across from Lee Ann's house was a trouble spot in the neighborhood *Page 17 
13. Byron Jackson
 {¶ 45} Mr. Jackson was Lee Ann's neighbor. He knew Lee Ann from seeing her take her daily walks in the neighborhood between 6:00 and 7:00 in the morning and again in the evening. Mr. Jackson owned the car in front of which Lee Ann's body was found. He identified a picture of the 1994 Mitsubishi Gallant and its parking spot in front of his house.
 {¶ 46} Mr. Jackson testified that he learned on August 6, 2006, of Lee Ann's death when he opened his front door to get his newspaper and saw the police surrounding his car. Mr. Jackson indicated that appellant had never been in or near his car.
14. Crystal Albright
 {¶ 47} Ms. Albright was Eric Humphrey's fianc É e and resided with him in Stacy Morgan's and Patricia Baughman's apartment complex on Anderson Street on August 5, 2006. Appellant also lived in the complex and was Eric's drinking buddy. On the night of August 5, 2006, Ms. Albright testified that appellant had gone to a bar with a woman and returned complaining to them about the woman and saying that, "his money wasn't good enough." Ms. Albright indicated that she did not know this woman other than that she lived in the complex. Ms. Albright then heard and saw the two arguing in the parking lot and saw appellant "wig out" after the woman went into her apartment and came out with another man. Ms. Albright testified that she saw appellant attack the man and the woman. She and *Page 18 
Eric calmed appellant down, but a few minutes later appellant attacked another woman down the hall, pulling her by her ponytail to the ground. Ms. Albright did not know that woman either. Eric again stopped appellant.
 {¶ 48} Ms. Albright testified that she next saw appellant on August 9, 2006, when he showed up at their apartment. She testified that it was unusual that they did not see appellant between August 5 and August 9, because Eric usually hung out with appellant every day. Ms. Albright and Eric both noticed that appellant was wearing new clothes and shoes. They especially noticed his shoes because they were not New Balance, the shoes appellant spoke of often as being the best. Ms. Albright indicated that appellant seemed puzzled; he kept telling them to turn down the music before the cops came. Ms. Albright testified that August 9, 2006, was the last time she saw appellant. Ms. Albright identified appellant in open court.
15. Eric Humphrey
 {¶ 49} Eric Humphrey was appellant's neighbor in the apartment complex in which Mr. Humphrey lived with his fianc É e, Crystal Albright. He and appellant were drinking and fishing buddies. Mr. Humphrey described appellant as being a normal guy except with regard to his attitude towards prostitutes. Mr. Humphrey indicated that appellant would regularly say things like, "F them. If the bitch wouldn't act right, he would make her act right." Mr. Humphrey took that to mean that appellant would get his money back from a prostitute if she did not act *Page 19 
right. Mr. Humphrey testified that appellant dated prostitutes who lived in the apartment complex.
 {¶ 50} Mr. Humphrey testified that appellant walked everywhere at any time and usually wore jeans, t-shirts with logos on them and black #338 New Balance shoes, which appellant had indicated were the most comfortable shoes for his feet. Mr. Humphrey testified that appellant wore those shoes every day.
 {¶ 51} Mr. Humphrey's testimony about the apartment complex events of August 5, 2006, coincided with that of the other witnesses. Mr. Humphrey further testified as to appellant's manner that night as having changed from being perfectly normal to that of an angry person. Mr. Humphrey acknowledged that he did not call the police that night.
 {¶ 52} Mr. Humphrey's testimony about seeing appellant on August 9, 2006, supported that of Crystal Albright. Mr. Humphrey further noted that appellant commented on his new clothes and shoes saying, he "had to switch it up."
 {¶ 53} Mr. Humphrey then testified that he saw appellant the next day in appellant's apartment and he acted nervous. Appellant told him that the police were looking for him. Mr. Humphrey indicated that he thought the police wanted appellant for something minor so he decided to help his friend by running away with him into the woods. Mr. Humphrey indicated he told appellant he would help him as long as he did not murder anyone, to which appellant did not respond other *Page 20 
than to tell him the police wanted him on an old warrant and that the police would find nothing at his house. Mr. Humphrey said appellant further indicated that if he was caught he would do 10 years and that, "he might as well get a gun and face it head on with the police."
 {¶ 54} Mr. Humphrey testified that when he left appellant, they planned to meet up again the next day at 4:00, so Mr. Humphrey could help appellant go on the run. He left appellant with his mother-in-law's phone number on a piece of paper. Mr. Humphrey identified photographs of the area to which he and appellant ran and the paper with his phone number on it.
 {¶ 55} The following day, Mr. Humphrey testified that he learned what happened to Ms. Cucuzza and spoke to the police. He accompanied the police to the place he escaped with appellant and gave them other information. Mr. Humphrey identified appellant in open court and identified a photograph of a pair of New Balance shoes like those appellant usually wore. Mr. Humphrey knew them as style #338 because he also had a pair and Mr. Humphrey and appellant walked together regularly.
16. Officer Bodnar
 {¶ 56} Officer Bodnar was the first officer who responded to the scene of Lee Ann Cucuzza's murder. The officer identified photographs of the scene, including the photographs showing Ms. Cucuzza's body lying next to a vehicle. The officer testified that he secured the block surrounding the site of Lee Ann's *Page 21 
body, called for other police personnel, and spoke to the residents at 860 Huber Street, including a child and his mother who had initially reported the incident. He did not talk to the owner of the vehicle next to which Ms. Cucuzza's body was found, although another officer did so. All of this information was contained in his report.
17. Detective Fox
 {¶ 57} Detective Fox was a detective in the Akron Police Department's Crime Scene Unit who responded to the scene of Ms. Cucuzza's murder. The detective testified that he then took photographs of the scene, including photographs of the victim's position between a Mitsubishi Gallant and the curb, as well as the victim's injuries. One photograph showed an indentation in the vehicle made by the victim's head and another showed money and keys taken from the victim's body. Detective Fox identified all of the pictures. The video of the crime scene was played for the jury and the detective described what the jury was seeing. He testified that Detective Frost also took latent fingerprints from the Mitsubishi.
18. Detective Frost
 {¶ 58} Detective Frost was a Crime Scene Unit detective who responded to the scene of Lee Ann Cucuzza's murder. The detective testified that he took the crime scene video played during Detective Fox's testimony. He also took the evidence collected and secured it in the crime scene van and processed the Mitsubishi for fingerprints. The detective identified a photograph showing Ms. *Page 22 
Cucuzza lying next to the Mitsubishi and identified her head as being next to the rear passenger side door, a few inches in front of the tire.
 {¶ 59} Detective Frost testified that he also went to the medical examiner's office on August 6, 2005, to examine the body prior to autopsy the next day. Detective Frost testified that he and a forensic investigator (David Turney) conducted a number of light source tests on Ms. Cucuzza's body, including tests for fingerprints. They were not able to develop any fingerprints from her body. They took test swabs of an unknown white substance from the victim's forehead and eyelid. All tests were documented and all test swabs processed according to proper protocol.
 {¶ 60} Detective Frost testified that he processed the finger prints developed from the rear passenger side of the Mitsubishi and matched them in the database to those of appellant. His conclusions were verified by another detective. The detective then sent the prints to BCI for further confirmation.
19. Jeffrey Houser
 {¶ 61} Jeffrey Houser worked for BCI. He tested the swabs Detective Frost took from Ms. Cucuzza's forehead and eyelid and determined the substance to be cocaine.
20. Michelle Snyder
 {¶ 62} Michelle Snyder was employed by BCI and processed the fingerprint evidence obtained from the Mitsubishi in the Lee Ann Cucuzza case. She *Page 23 
identified four fingerprints, all corresponding to appellant's left thumb. Ms. Snyder also testified that in between the latent fingerprints, she identified a speck of biological fluid that she forwarded to DNA/serology technicians, Lynda Eveleth and Stacy Violi. Ms. Snyder acknowledged that she could not determine when the finger prints or biological fluid was left on the vehicle. Ms. Snyder authenticated the document that reported her findings.
21. Lynda Eveleth
 {¶ 63} Ms. Eveleth was employed by BCI in the DNA/serology division. Ms. Eveleth testified that she tested various articles of appellant's clothing for the presence of blood in the Shelly Peterson case and appellant's clothing and swabs from bathroom and kitchen sink traps for the presence of blood in the Lee Ann Cucuzza case. The presence of blood was found on most of the clothing and on both of the sink trap swabs. Ms. Eveleth also testified that the biological fluid found on the fingerprint card, testified to by Ms. Snyder, was blood. Ms. Eveleth authenticated the document that reported her findings.
22. Regina King
 {¶ 64} Regina King was a detective in the Akron Police Department's Crimes Against Persons Unit who responded to the scene of Lee Ann Cucuzza's death. Ms. King testified that she tagged and entered Ms. Cucuzza's DNA standard into evidence at the Akron Police Department for further testing. *Page 24 
23. Stacy Violi
 {¶ 65} Ms. Violi was employed by BCI in the DNA/serology department. Ms. Violi testified that she processed the items that tested positive for blood received by Ms. Eveleth in both the Peterson and Cucuzza cases. Ms. Violi authenticated the documents that reported her findings. With regard to the clothing tested in the Peterson case, Ms. Violi testified that Shelly Peterson could not be excluded as the source of the DNA and no blood was found on the swab from appellant's hands. With regard to the evidence tested in the Cucuzza case, Ms. Violi testified that Ms. Cucuzza's DNA was present in appellant's finger print taken from the Mitsubishi and that appellant's DNA was present on the clothing. Ms. Violi testified that no DNA profile could be obtained from the sink swabs.
 {¶ 66} On cross-examination, Ms. Violi acknowledged that an unknown DNA profile was found on the left shoe in the Peterson case and confirmed that the DNA profile found on the right shoe, the jacket and the jeans was consistent with Shelly Peterson. Appellant's DNA was not found on the jacket from the Peterson case.
24. Detective Morrison
 {¶ 67} Detective Morrison worked in the Akron Police Department's Crimes Against Persons Unit and participated in the Cucuzza investigation. His job duty was to find appellant. On August 11, 2006, he and Detective Hudnall went to appellant's apartment complex and spoke to Eric Humphrey and his *Page 25 
girlfriend, who verified which unit was appellant's apartment. When appellant did not respond to knocks or phone calls, they secured the apartment and obtained a warrant. The detective described appellant's apartment as neat and orderly and the cleanest apartment he has ever been in. Detective Morrison indicated that they took various items from the apartment for testing. Later that day, the detective testified that he got a phone call from appellant's sister stating that he had called her from a downtown Akron hotel. Officers apprehended appellant in downtown Akron. From appellant's person, the detective testified that they obtained cash and a bag containing shoes. The detective then authenticated a photograph taken of appellant at the time of his arrest in which he is wearing the "new" clothes described by Crystal Albright and Eric Humphrey. The detective also identified another photograph of appellant's hand with a recent mark on the right middle knuckle. Finally, the detective identified appellant in open court.
 {¶ 68} On cross-examination, the detective acknowledged that they did not find any cocaine or obvious blood in appellant's apartment and that they saw no recent injuries on appellant's left hand.
25. Detective Hayes
 {¶ 69} Detective Hayes was employed by the Akron Police Department in the Crimes Against Persons unit. Detective Hayes took swabs from appellant's hands in the Peterson case and placed them into the evidence vault.
 26. Detective Bell *Page 26 
 {¶ 70} Detective Bell was employed by the Akron Police Department in the Crimes Against Persons Unit. Detective Bell was part of the investigation of Lee Ann Cucuzza's death. Detective Bell testified that he canvassed the area of Ms. Cucuzza's death for potential witnesses. During his canvass, the day after the murder, the detective spoke to Susan Estes, who lived in an apartment one-half block away from the crime scene. His interview with Ms. Estes was tape-recorded.
 {¶ 71} Detective Bell was also involved in the search of appellant and interviewed Eric Humphrey two or three times. Detective Bell testified that Mr. Humphrey showed him the spot to which he and appellant ran the day police were in the complex. The detective also testified that police were able to identify appellant when he was arrested based on Mr. Humphrey's description of the clothing appellant was wearing. The detective's testimony as to what he was told by Mr. Humphrey and Ms. Albright substantially supported their testimony at trial. The detective finally testified that the summaries of his interviews with Mr. Humphrey, Ms. Albright, and Ms. Estes were in his report. 27. LisaKohler, M.D.
 {¶ 72} Dr. Kohler was the forensic pathologist in the Summit County Medical Examiner's office who autopsied Ms. Cucuzza's body on August 7, 2006. Dr. Kohler authenticated the report of her findings. Dr. Kohler indicated that Ms. Cucuzza was a 48-year-old white female who was five feet, 4 inches tall and *Page 27 
weighed 134 pounds and she was wearing a blood-stained t-shirt, shorts, underpants, bra and a pair of shoes upon arrival at her office.
 {¶ 73} Dr. Kohler testified that Ms. Cucuzza had substantial trauma to her head and face, including bruising, cuts and broken bones. Much of the scalp was bruised and there was a three and one-half inch laceration on the back of the head exposing the skull. The collar bone, shoulders, chest and arms were also bruised. Some of the bruising corresponded with the shape and tread of a heel of a pair of new New Balance tennis shoes provided to her by police. Bruising and marks on the victim's forehead corresponded to the tread of the toe of the New Balance tennis shoes. Dr. Kohler acknowledged that she cannot state that these bruises were absolutely caused by a shoe. There was also a tear on Ms. Cucuzza's left ring finger.
 {¶ 74} Dr. Kohler indicated that there were internal injuries consistent with what they saw externally, including blood in the cerebral spine fluid, fluid on the brain (hydrocephalus), hemorrhage in the frontal lobes of the brain, and bruising on the orbital surfaces of the front lobes, the left temporal and parietal lobes and the brain tissue. Dr. Kohler also indicated that the victim's ribs were fractured, the liver cut, and there was bleeding into the lung cavity. Dr. Kohler then identified pictures of Ms. Cucuzza taken during her autopsy.
 {¶ 75} From these injuries, the doctor determined that Ms. Cucuzza had suffered multiple blows to the head, or blunt-force trauma. Ms. Cucuzza's injuries *Page 28 
were so severe that she was identified by comparing her teeth to those of a photograph produced by the family. Dr. Kohler testified that a toxicology screen of the victim did not indicate the presence of drugs or alcohol. Dr. Kohler finally testified that Ms. Cucuzza died from injuries sustained from blunt-force trauma.
28. Sergeant Hudnall
 {¶ 76} Sergeant Hudnall was a supervisor in the Akron Police Department's Crimes Against Persons Unit and was part of the team that investigated Lee Ann Cucuzza's murder. Sergeant Hudnall interviewed Gino Cucuzza, the victim's husband who signed a waiver to allow police to search his house. The sergeant testified that they followed up on all information received in the department but determined that there was no value to this information. The sergeant identified a map of the area which indicated Ms. Cucuzza's home, where her body was found, appellant's apartment and the home of Susan Estes. Sergeant Hudnall acknowledged that there had been 62 calls to the police from the location in the past year regarding all sorts of crimes.
 {¶ 77} The sergeant indicated that police made the connection between Shelly Peterson's assault and Lee Ann Cucuzza's murder after the sergeant spoke to Detective McFarland. The sergeant then directed the efforts to find appellant.
 {¶ 78} The search warrant executed on appellant's apartment was videotaped and the sergeant identified the videotape, which was played in open court, with the sergeant's narration. Sergeant Hudnall then identified a New *Page 29 
Balance shoe box (style 338, size 10) taken from appellant's closet. A receipt dated January 29, 2003, was inside the box. The sergeant indicated that after finding the shoe box, he subpoenaed from the manufacturer a pair of shoes matching the specifications on the box, as verified by the manufacturer. The shoes received were the shoes given to Dr. Kohler that she referenced in her report and testimony. The sergeant finally indicated that although they searched, police did not find the shoes that were originally in the shoe box found in appellant's closet.
 {¶ 79} On cross-examination, the sergeant acknowledged that police did not find any drugs, contraband, or blood traces belonging to Ms. Cucuzza in appellant's apartment.
29. Janet Lookabaugh
 {¶ 80} Ms. Lookabaugh was a long time friend of Lee Ann Cucuzza who spoke to Lee Ann two weeks prior to hear death. Ms. Lookabaugh indicated that Lee Ann expressed concerns to her about the apartment building across the street because of drug and prostitution activity that occurred there. Ms. Lookabaugh further indicated that Lee Ann had told her that one of the prostitutes had confused Lee Ann for a prostitute when Lee Ann was standing there with her dog. Lee Ann never indicated to her that she thought she was being stalked.
 {¶ 81} On appeal, appellant argues that the evidence establishes that appellant was not properly identified in the Peterson case and that no eyewitness testimony positively identified appellant as the assailant in the Cucuzza case. *Page 30 
Appellant further argues that a search of his apartment revealed no contraband or any other direct evidence and that he made no confession or statement that linked him to Ms. Cucuzza's death. In fact, appellant asserts that he expressly denied his involvement to Mr. Humphrey. To support his argument that his conviction was against the manifest weight of the evidence, appellant simply asserts that, "[t]he [State's] witnesses in the instant case either lacked credibility to be persuasive as to reasonable doubt, or they lacked accuracy in their testimony to convince a jury of the Defendant-Appellant's guilt beyond a reasonable doubt." This was a point worth arguing to the jury, who were obligated to assess the evidence critically, under the strict beyond a reasonable doubt standard. However, on appeal, this Court assesses the evidence liberally, considering whether the evidence weighs so heavily against the conviction that the necessary conclusion is that "the jury clearly lost its way and created a manifest miscarriage of justice."Thompkins, 78 Ohio St.3d at 387.
 {¶ 82} Based on our review of the entire record, we conclude that appellant's criticisms of the State's evidence in this case are inadequate to prove that the jury lost its way and created a manifest miscarriage of justice. Id. Rather, we find it reasonable that the jury believed the State's version of the events, disbelieved the defense and convicted appellant accordingly. We conclude that the conviction was supported by sufficient evidence and was not against the *Page 31 
manifest weight of the evidence. Appellant's third and fourth assignments of error are overruled.
 ASSIGNMENT OF ERROR V "IT WAS PREJUDICIAL ERROR FOR THE COURT TO EXCLUDE THE TAPED INTERVIEW OF SUSAN ESTES FROM THE JURY'S REVIEW."
 {¶ 83} Appellant asserts that the trial court erred in excluding the taped police interviews of Susan Estes pursuant to Evid.R. 804(A)(5). Ms. Estes was a witness to the attack on Lee Ann Cucuzza and saw two black men running away from the scene. The defense claims this is potentially important because appellant is a white man. Appellant proffered the tape and related transcript into the record.
 {¶ 84} The State asserts the tape was inadmissible hearsay and that appellant failed to establish that an exception to the hearsay rule that would allow its admission.
 {¶ 85} A trial court possesses broad discretion with respect to the admission of evidence. State v. Maurer (1984), 15 Ohio St.3d 239, 265. An appellate court will not disturb evidentiary rulings absent an abuse of discretion. State v. Roberts, 156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, *Page 32 
an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 86} Appellant asserts that Ms. Estes's taped interview was admissible pursuant to Evid.R. 804(A), but it is Evid.R. 804(B) that sets forth hearsay exceptions where a witness is unavailable. "In Ohio, a statement that would otherwise be excluded as hearsay may be admitted if the declarant is `unavailable' as defined in Evid.R. 804(A)and the statement falls within one of the five exceptions in Evid.R. 804(B)[.]" (Emphasis sic). State v. Williams (1988), 38 Ohio St.3d 346,349, at fn 6.
 {¶ 87} After hearing arguments on the issue of Ms. Estes, the trial court found Ms. Estes to be unavailable. However, the trial court also found there was no "rule that would permit her alternative statements into evidence." We agree. Appellant failed to argue at trial and on appeal that any specific 804(B) exception applied that would permit Ms. Estes' taped interview/transcript to be admitted after she was declared unavailable as a witness pursuant to Evid.R. 804(A)(5). Accordingly, the trial court did not abuse its discretion in excluding Ms. Estes's taped interview and related transcript from the jury.
 {¶ 88} Appellant's fifth assignment of error is overruled. *Page 33 
 ASSIGNMENT OF ERROR VI "THE TRIAL COURT COMMITTED ERROR BY SENTENCING THE [APPELLANT] TO CONSECUTIVE SENTENCES ON THE MURDER AND FELONIOUS ASSAULT COUNTS."
 {¶ 89} In his last assignment of error, appellant contends that the trial court erred when it ordered him to serve his sentence for the murder conviction consecutive to the sentence for the felonious assault conviction. Appellant argues that the court's findings were not supported by the record. Appellant urges this Court to remand the case to the trial court for re-sentencing.
 {¶ 90} In State v. Ortega, 9th Dist. No. 05CA008657, 2006-Ohio-2177, we held:
 "In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, paragraphs three and four of the syllabus, the Ohio Supreme Court found R.C. 2929.14(E) to be unconstitutional and excised that section from the statute. State v. Dudukovich, 9th Dist. No. 05CA008729, 2006-Ohio-1309, at ¶ 19-20. This Court has construed the court in Foster as having excised R.C. 2953.08(G) for the same reason. Dudukovich at ¶ 20, citing Foster at ¶ 97.
 "Trial courts are no longer required to make the statutory findings listed in R.C. 2929.14(E) for the imposition of consecutive sentences. State v. Mathis, 109 Ohio St.3d 54, 846, 2006-Ohio-855, paragraph one of the syllabus. Foster `grant[ed] trial court judges full discretion to impose sentences within the ranges prescribed by statute.' Dudukovich at ¶ 19." Ortega at ¶ 29-30.
 {¶ 91} The trial court's sentencing entry imposed sentences prescribed by statute upon appellant and ordered them to be served consecutively. Based upon the foregoing, appellant's sixth assignment of error lacks merit and is overruled. *Page 34 
 III. {¶ 92} Each of appellant's assignments of error is overruled and the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to appellant. *Page 35 
 MOORE, J. DICKINSON, J. CONCUR. *Page 1